IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DIXON,<br><br>　　　　Petitioner,<br><br>　v.<br><br>A.A. LAMARQUE, Warden,<br><br>　　　　Respondent.<br>_____ | No. C 01-4974 MMC (PR)<br><br>**AMENDED<br>ORDER GRANTING PETITION<br>FOR WRIT OF HABEAS CORPUS** |

    Petitioner is a California prisoner who filed pro se a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 22, 2002. The petition was dismissed with leave to amend and, on March 20, 2002, Petitioner filed a First Amended Petition. The Court ordered Respondent to show cause why the petition should not be granted, and Respondent filed a motion to dismiss on the ground that six of the seven claims in the First Amended Petition were not exhausted. On July 9, 2002, the Court found five of the seven claims had not been exhausted and, on that basis, dismissed the First Amended Petition with leave to file a Second Amended Petition containing only the two exhausted claims. On August 20, 2002, Petitioner filed a Second Amended Petition containing only his two exhausted claims and Respondent was ordered to show cause why the Second Amended Petition should not be granted. Respondent filed an answer and memorandum, denying the petition. Petitioner filed a traverse.

On April 7, 2004, because Petitioner indicated that he wished to present new claims herein, the Court ordered him to do so by filing a Third Amended Petition. Petitioner filed a Third Amended Petition on May 20, 2004, which the Court found deficient but allowed Petitioner one further opportunity to present his new claims in an amended petition. On September 9, 2004, Petitioner filed a document titled "Third Amended Petition," in which he indicated he did not wish to present any new claims, but rather to proceed on the basis of the claims in his Second Amended Petition. Consequently, the operative petition is the Second Amended petition, containing two exhausted claims.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

In September 1998, in the San Francisco County Superior Court, a jury convicted Petitioner of forcible rape, forcible sodomy, forcible digital penetration, aggravated assault, and false imprisonment. The jury failed to reach a verdict on two counts of forcible oral copulation and an additional count of digital penetration, and the trial court dismissed those three counts.

At the trial, Loretta B. ("Loretta") testified that she was assaulted by Petitioner, her friend and neighbor, in May 1997. In April, 1997, Petitioner had moved into the same residential hotel in which Loretta resided and began living down the hall from Loretta. Loretta recognized Petitioner as a co-worker from years earlier. Loretta and Petitioner became close friends. They were not lovers.

Loretta testified that, on May 1, 1997, Loretta, Petitioner, and Loretta's friend, Deborah, were sitting around the table in Deborah's house, talking and drinking. Loretta had a couple of sips of wine and Petitioner drank a lot of gin. Later, Deborah dropped Loretta and Petitioner home. The two went to their separate rooms after agreeing to get together later to eat dinner and watch movies. Loretta cleaned, prepared for dinner, drank half a can

---

[1] This background is derived from the factual background set forth in the opinion of the California Court of Appeal, lodged herewith as Respondent's Exhibit A, which is not disputed by the parties. See also 28 U.S.C. § 2254(e)(1) (requiring district court to presume correct state court's factual findings unless the petitioner rebuts the presumption of correctness by clear and convincing evidence).

2

United States District Court
For the Northern District of California

of beer, and was getting ready to change her clothes when Petitioner knocked on Loretta's door and said: "Come here. Come with me right now." Loretta thought Petitioner was having trouble with his VCR, as he often did. Loretta went with Petitioner to his room.

Loretta further testified that, once in his room, Petitioner asked her, "Do you love me?" and "Do you want me?" Loretta responded: "Are you crazy?" Petitioner asked: "Why did you lie to me?" Bewildered, Loretta said, "Michael, you have been drinking. You're intoxicated. Go to sleep. I'll be back after a while." Petitioner responded by slapping Loretta on the face. Loretta went for the door but Petitioner dragged her away saying, "You're not going nowhere." Petitioner pinned Loretta on the floor as she screamed, "Stop" and "Let me go." Petitioner then pulled Loretta off the floor and threw her on the bed. Petitioner pressed a large empty beer bottle against Loretta's forehead. Loretta thought the bottle would break since he was pressing it so hard that he was dripping sweat. Loretta managed to push the bottle away, but then Petitioner pressed her temples with his hands, while saying, "Don't look at me." Loretta screamed: "Michael, it hurts" and "Please stop." Petitioner responded: "Oh, you want pain? I'll show you pain."

Loretta testified that she pleaded with Petitioner to permit her to use the bathroom. When Loretta was using the commode, Petitioner stood in front of her, dropped his pants, and asked Loretta to lick his buttocks and massage his testicles. When Loretta said, "You must be crazy. You're sick," Petitioner slapped her face and put her hands on his testicles. Loretta refused to comply again, and Petitioner slapped her again. Loretta then put her tongue in Petitioner's rectum and held his testicles. Petitioner was dissatisfied. He slapped Loretta and asked her to orally copulate him. He held her head and shoved his penis in her mouth. When Loretta gagged and fell on the bathroom floor, Petitioner grabbed her arm and dragged her away. Petitioner kicked her back and buttocks. Loretta ran screaming to the bathroom where she tried to close the door against Petitioner, but he kicked it open.

A neighbor testified that he heard Loretta screaming for help and heard a fist repeatedly hitting flesh. He could hear the noise through the air shaft onto which Petitioner's bathroom window opened. The neighbor rushed to his own window on the air shaft. Since

3

he could not get to Loretta, he threw a teacup out his window and into Petitioner's bathroom window where it broke a hole in the glass.

Loretta testified that she saw the teacup come through the window. Petitioner pulled her into his living room and raped her, forcing his penis into her vagina. Petitioner also put his finger into her vagina and rectum, and put his penis into her rectum. Petitioner hit Loretta and kept saying: "I'm going to kill you, bitch."

The hotel clerk testified that, after receiving a telephone call from the neighbor across the air shaft, he came to Petitioner's room and knocked on the door. Both the clerk and the neighbor testified that they heard Loretta saying she wanted to get out. The clerk left to call the police.

Officer Garrity, the police officer who responded to the clerk's call, testified that he heard a woman crying inside Petitioner's room. The officer knocked on the door and identified himself. Petitioner opened the door and Loretta said to the officer: "Help me, let me out." Loretta ran out of the room and the officer saw that her face was swollen and bloody. Loretta told the officer that she and Petitioner had been friends but, on that night, he had held her in his room against her will and raped her. Officer Garrity called for assistance and he and other officers went to Petitioner's room to arrest him. When Officer Garrity knocked on the door, Petitioner told the officers, "Come get me, fuckers." Petitioner then quickly closed the door as the officers came forward. Petitioner opened and closed the door in the officers' faces four times. He finally was grabbed and taken into custody.

Officer Bulsalacchi, who interviewed Loretta at the hospital, testified that Loretta was shaking and crying. When asked whether she had been having sexual relations with Petitioner, Loretta answered in the affirmative and said they had had relations for about three months. At trial, Loretta testified that she was in a state of shock when she spoke with the officer and denied any sexual relationship with Petitioner.

The nurse who performed a sexual assault examination on Loretta testified that Loretta had bruises on her face, torso, arms, back and buttocks. Loretta also had fresh abrasions on her vagina, suggestive of forced intercourse. An examination of Petitioner

found that the surface of his penis had cells matching orifice cells from Loretta, either her mouth, anus, or vagina.

Also at the trial, Jewell R. ("Jewell") testified that, in 1992, she was "partying" with her friend Barbara and Petitioner, who at that time was Barbara's boyfriend. Jewell fell asleep in the living room and was awakened by screaming. Barbara and Petitioner were arguing over money. Jewell went into the bedroom when she heard Barbara calling her and found that Barbara's forehead was bleeding and Petitioner was holding a broken brandy bottle. Petitioner repeatedly slapped Barbara and then threw Jewell on the bed. Petitioner told Barbara, "I'm going to show you what it's like to make love to a real woman," and forced his penis into Jewell's vagina. He also unsuccessfully tried to force Barbara to have oral sex with Jewell. Jewell phoned the police. Jewell's sexual assault examination revealed abrasions suggestive of forced intercourse.

Petitioner denied raping Loretta and testified that he and Loretta had begun a sexual relationship soon after he moved into the residential hotel. On the day in question, Loretta came to his room drunk and initiated oral copulation of him. Petitioner fell asleep and then awoke to go to the bathroom. Loretta followed him to the bathroom and began talking loudly about her fear that Petitioner would desert her. At that point, someone threw a cup through Petitioner's bathroom window, which struck Loretta in the head. The hotel clerk came and later the police. Petitioner further testified that he refused to come out of his room because he did not want to go to jail for "some bullshit." Petitioner was on parole for the 1992 assault upon his girlfriend, Barbara.

Petitioner denied raping Jewell in 1992; he testified that Jewell had propositioned him when Barbara was out of the house and that he and Jewell had consensual sex. When Barbara returned, the three partied together. Later, he and Barbara fought and he "slapped her upside the head." The fight blew over, however, and Petitioner spent the night without incident.

A woman from Petitioner's church testified on his behalf. She said Loretta told her that she was in love with Petitioner and was going to marry him.

5

The jury convicted Petitioner of a number of sexual acts, specifically, forcible rape, forcible sodomy, and forcible digital penetration, as well as aggravated assault and false imprisonment. On January 28, 1999, the trial court, after finding Petitioner had two prior convictions, one of which was a "strike," sentenced him to an aggregate prison term of 30 years in state prison. The California Court of Appeal affirmed. The Supreme Court of California summarily denied both the petition for direct review and a subsequent petition for a writ of habeas corpus.

**DISCUSSION**

A. Standard of Review

The instant petition is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") of 1996. Under AEDPA, the district court may grant habeas relief only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Habeas relief is warranted only if the constitutional error at issue had a "'substantial and injurious effect or influence in determining the jury's verdict.'" Penry v. Johnson, 121 S. Ct. 1910, 1920 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)). In the present case, this Court reviews the decision of the California Court of Appeal, the last state court to address Petitioner's claims in a reasoned decision. See LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

B. Legal Claims

   1. Jury Instructions: Standard of Proof

Petitioner argues that the jury instructions regarding the use of evidence of Petitioner's alleged prior sexual offense violated his right to due process by lowering the prosecution's burden of proving guilt beyond a reasonable doubt. The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

See In re Winship, 397 U.S. 358, 364 (1970).

Under California law, evidence of prior "bad acts" ordinarily is inadmissible to prove criminal disposition. See Cal. Evid. Code § 1101(a). California Evidence Code §1108 provides one of the exceptions:

> In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352.[2]

Cal. Evid. Code § 1108.

Here, as set forth above, the trial court allowed evidence of prior sex crimes. As a result, the trial court instructed the jury pursuant to CALJIC No. 2.50.01, titled "Evidence of Other Sexual Offenses (Evidence Code § 1108)." In 1999, CALJIC No. 2.50.01 was amended to clarify the manner in which jurors are to evaluate guilt of a current charge where they have found the defendant committed a prior sex crime.[3] The jury in petitioner's case, however, received the pre-1999 version of CALJIC No. 2.50.01, which read in relevant part as follows:

> If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit such sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he is likely to commit and did commit the crimes with which he is accused n this case.
>
> Unless you are instructed otherwise, you are not to consider this evidence for any other purpose.

(Reporter's Transcript ("RT") at 1017-18). The above language was read to the jury in

---

[2] Section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

[3] The following paragraph was added to CALJIC No. 2.50.01 in 1999 : "However, if you find by a preponderance of the evidence that the defendant committed [a] prior sexual offense[s], that is not sufficient by itself to prove beyond a reasonable doubt that [he] [she] committed the charged crime[s]. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime."

7

conjunction with a modified version of another jury instruction, CALJIC No. 2.50.1, which ascribed a lesser burden of proof to previous sex offenses:

> Within the meaning of this instruction, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed sexual offenses other than those for which he is on trial. You must not consider this evidence for any purpose unless you find, by a preponderance of the evidence, that the defendant committed the sexual offenses described in the prior testimony.

(Reporter's Transcript ("RT") at 1017-18).

Petitioner argues that the above instructions, taken together, allowed the jury to find him guilty by a preponderance of the evidence rather than beyond a reasonable doubt. Petitioner further argues that these instructions, even when considered in the context of all the jury instructions, failed to clarify for the jurors that each element of the crime must be proven beyond a reasonable doubt. Petitioner contends he was denied due process, for the reason that the jury might have used the wrong standard of proof and it is impossible to determine what standard the jury in fact employed in deciding the case.

In affirming the convictions, the California Court of Appeal determined that the instructions, when read as whole, did not mislead the jury. In that regard, the Court of Appeal reasoned that the original and revised versions of CALJIC No. 2.50.01 are not significantly different; in particular, the Court of Appeal found that although the instructions given to the jury lacked a reiteration of the correct standard of proof as provided by the revised version of CALJIC No. 2.50.01, they nevertheless were constitutionally sufficient.

The Ninth Circuit has held the use of the pre-1999 version of CALJIC 2.50.01 in tandem with CALJIC 2.50.1 unconstitutionally lowers the prosecution's burden of proof and is sufficient ground for habeas relief under the AEDPA standard. See Gibson v. Ortiz, 387 F.3d 812 (9th Cir. 2004). In Gibson, the Ninth Circuit, after first noting that Gibson was tried in October 1998, further observed that the Due Process principle established by the Supreme Court in Winship, specifically, that the prosecution must prove every element charged in a criminal offense beyond a reasonable doubt, is "a proposition of which there could be no doubt when Gibson was tried." See Gibson, 387 F.3d at 817, 820; see also In re Winship, 397 U.S. at 364. The Ninth Circuit then concluded that the jury instructions given

8

at Gibson's trial ran "directly contrary to Winship's maxim." Id. at 822. The Ninth Circuit thus held the state court's adjudication upholding the instructions was contrary to clearly established Federal law as determined by the Supreme Court of the United States in Winship, and affirmed the District Court's decision to grant habeas relief under § 2254. See id. at 823.

The instructions at issue in Gibson read, in pertinent part:

> If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to infer that he was likely to commit and did commit the crime or crimes of which he is accused.
>
> Within the meaning of the preceding instructions the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed sexual offenses and/or domestic violence other than those for which he is on trial.

Id. at 817-18. The Ninth Circuit found said instructions impermissibly lowered the prosecution's burden of proof. See id. at 822. In particular, the Ninth Circuit found that because the jurors were informed they could find the defendant committed the charged offenses if they found he committed the prior offenses, and because they were further instructed that the prior offenses could be proved by a simple preponderance of the evidence, the jury effectively had been instructed that the defendant could be found guilty based on a preponderance of the evidence. See id. In so holding, the Ninth Circuit noted it was the "interplay" of the instructions there at issue that allowed the jury to convict based on a preponderance of the evidence, see id., and found it significant that the jury was not told how the instructions they received as to the standard of proof for the prior offenses could be "harmonized" with the instructions they received as to the standard of proof for the charged offenses, see id. at 823. Although the jury in Gibson had received the standard instruction on reasonable doubt (CALJIC No. 2.01) as well as on the presumption of innocence (CALJIC No. 2.90), the Ninth Circuit found CALJIC No. 2.50.01 gave the jury "an alternate means of conviction with a lesser standard of proof than is required by the Constitution." See id. at 825. Moreover, the Ninth Circuit found, while the constitutionally correct instructions provided general guidelines, CALJIC No. 2.50.01 carved out a specific exception; the Ninth

9

Circuit further reasoned that the well-settled rule of construction, "that the specific controls the general," applies to jury instructions as well, rendering the instructions in Gibson's trial unconstitutional overall. See id. at 823.

The instant case is indistinguishable from Gibson. The jury instructions at issue here are virtually identical to the instructions at issue in Gibson. As in Gibson, the preponderance standard combined with CALJIC 2.50.01 to provide an alternative to the general reasonable doubt standard, thus affording the jury "two routes of conviction, one by a constitutionally sufficient standard and one by a constitutionally deficient one." See id. at 823. Here, as in Gibson, the trial court provided the jury with appropriate general instructions on the presumption of innocence, on the prosecutor's burden of proof, and on considering the jury instructions as a whole. As Gibson held, however, such additional instructions do not suffice to cure the defect in the challenged instructions.

Respondent attempts to distinguish the present case from Gibson by contending that the Gibson court was heavily swayed by the prosecution's closing argument, wherein the prosecutor emphasized the preponderance standard for purposes of showing "a disposition," from which the jury then was encouraged to "make these inferences that [the defendant] did in fact commit these crimes." See Gibson, 387 F.3d at 824. Gibson did quote portions of the prosecutor's summation, and acknowledged that a prosecutor's arguments are to be considered "as a part of the context for evaluating the challenged instructions." See id. Arguments of counsel, however, generally carry less weight with a jury than do instructions from the court. See Boyde v. California, 494 U.S. 370, 384-85 (1990). As the court in Gibson itself clarified: "[T]he prosecutor's arguments are weighted much less heavily in our analysis than the instructions of the trial judge." Gibson, 387 F.3d at 824. Indeed, the determination by the Gibson court was reached prior to its discussion of the prosecutor's closing argument. See id. at 822. ("When viewed as a whole, there is nothing ambiguous or confusing about the challenged instructions. . . . However, the burden of proof the

instructions supplied for the permissive inference was unconstitutional.")[4] Consequently, although the prosecutor in the instant case did not make the same argument as the prosecutor in Gibson, the core of the Gibson decision – that without clarifying language the interplay between CALJIC No. 2.50.01 and CALJIC No. 2.50.1 renders the jury instructions unconstitutional – is equally applicable.

In sum, Gibson is dispositive. The instructions in this case are effectively the same as those found unconstitutional in Gibson. Accordingly, as the Ninth Circuit held in Gibson, the California Court of Appeal's opinion rejecting Petitioner's due process claim was an unreasonable application of "clearly established" Supreme Court law that existed at the time of Petitioner's trial. See 28 U.S.C. § 2254(d).

    2. Jury Instructions: Propensity Evidence

Petitioner's second claim is that CALJIC No. 2.50.01 violated his constitutionally protected right to due process because it allowed him to be convicted of the current offense based solely upon the jury's determination that he committed the prior offense. Petitioner's claim is unavailing. In Gibson, the Ninth Circuit found no constitutional error in CALJIC No. 2.50.01, stating: "Had the jury instructions ended with CALJIC 2.50.01, our inquiry would have ended with a denial of Gibson's petition." See Gibson, 387 F.3d at 822. As discussed above, the Ninth Circuit granted the habeas petition in Gibson not because the jury was given CALJIC No. 2.50.01, but rather because CALJIC No. 2.50.01 was followed immediately by CALJIC No. 2.50.1, which lowered the prosecution's burden of proof, thus rendering the jury instructions "constitutionally infirm." See id.

To the extent Petitioner argues the use of propensity evidence violated his due process rights, that argument likewise fails. In rejecting this claim, the Court of Appeal noted that the California Supreme Court has affirmed the constitutionality of Evidence Code § 1108.

---

[4] It would appear that the Gibson Court's purpose in discussing the prosecutor's closing remarks was to demonstrate that the prosecution itself had understood the challenged instruction as unambiguously permitting a finding of guilt based on essential facts proved by less than beyond a reasonable doubt. See id. at 824. ("[I]t is ironic that the State now urges us to reject the very interpretation of CALJIC No. 2.50.01 that the prosecution advanced to the jury.")

11

Specifically, the Court of Appeal cited the California Supreme Court's decision in People v. Falsetta as holding that § 1108 properly "expands 'the admissibility of disposition or propensity evidence in sex offense cases.'" (See Resp.'s Ex. A at 6 (quoting People v. Falsetta, 21 Cal.4th 903, 911 (1999)).)

To date, the United States Supreme Court has not ruled on whether the use of propensity evidence violates due process; rather, the Supreme Court has expressly declined to rule on the constitutionality of the use of propensity evidence. See Estelle v. McGuire, 502 U.S. 62 (1991). As discussed above, law clearly established by the United States Supreme Court is a prerequisite to habeas relief pursuant to § 2254(d)(1). See Williams v. Taylor, 529 U.S. 362, 412 ("Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence.").

Moreover, although federal courts have not addressed the specific question of whether California Evidence Code § 1108 violates due process, federal courts addressing the admission of prior sexual offenses under parallel federal evidentiary rules have found the admission of such evidence comports with due process provided its prejudicial effect does not outweigh its probative value. See Fed. R. Evid. 403, 413, 414; United States v. LeMay, 260 F.3d 1018, 1031 (9th Cir. 2001); United States v. Mound, 149 F.3d 799, 801 (8th Cir. 1998); United States v. Enjady, 134 F.3d 1427, 1433 (10th Cir. 1998).

Accordingly, it was neither an unreasonable application of nor contrary to federal law for the state court to find Petitioner's due process rights had not been violated by the admission of propensity evidence under California Evidence Code § 1108. As set forth above, however, Petitioner's first claim provides a clear basis for relief. Petitioner thus is entitled to habeas relief under 28 U.S.C. § 2254.

//
//
//
//
//

**CONCLUSION**

In light of the foregoing, the petition for a writ of habeas corpus is GRANTED.

Respondent shall release Petitioner from custody, unless, within ninety (90) days of the filing of this order and entry of judgment thereon, the state (1) commences retrial proceedings on the sex offense charges, or (2) commences re-sentencing proceedings on the two charges that are not affected by this Court's order.

All pending motions are terminated.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: August 9, 2007

_____
MAXINE M. CHESNEY
United States District Judge